# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
#### No. 5:21-CV-356

|  |  |  |
|---|---|---|
| SABARA FISHER ROBERTS,<br>individually and as administrator<br>of the estate of Adrian Roberts, | )<br>)<br>)<br>) |  |
| Plaintiff, | )<br>) | **ORDER** |
| v. | )<br>) |  |
| CUMBERLAND COUNTY, et al., | )<br>)<br>) |  |
| Defendants. | ) |  |

On September 3, 2021, Sabara Fisher Roberts ("Sabara Roberts" or "plaintiff"), individually and as administrator of Adrian Roberts's estate, filed an action against Deputy P. A. Hernandez ("Hernandez"), Deputy P. Sansome ("Sansome"), Deputy J. Evans ("Evans"), Deputy D. Doody ("Doody"), Deputy L. Fermin ("Fermin"), Deputy R. Murphy ("Murphy"), Sergeant R. Stallings ("Stallings"), Captain C. Parker ("Parker"), and Cumberland County. See Compl. [D.E. 1]. On December 8, 2021, defendants answered [D.E. 46]. On December 21, 2021, Sabara Roberts amended her complaint [D.E. 47], dropping Cumberland County from the action and adding Sheriff Ennis Wright ("Wright"). See id. at 1. The lawsuit stems from the death of Adrian Roberts, who was Sabara Roberts's husband. Deputy Evans shot and killed Adrian Roberts (a mentally ill veteran) while attempting to execute a state-court involuntary commitment order. Sabara Roberts alleges: (1) unlawful entry in violation of the Fourth Amendment of the United States Constitution under 42 U.S.C. § 1983 against all defendants, (2) excessive force in violation of the Fourth Amendment of the United States Constitution under 42 U.S.C. § 1983 against all defendants, (3)

failure to accommodate in violation of Title II of the Americans with Disabilities Act, 29 U.S.C. § 12132, et. seq. ("ADA") against Wright only, and (4) failure to accommodate in violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq., ("section 504") against Wright only. See id. at ¶¶ 53–77. On March 3, 2023, the parties stipulated a dismissal with prejudice for Hernandez, Sansome, Doody, Fermin, Murphy, Stallings, and Parker [D.E. 70], leaving only Evans and Wright (collectively, "defendants") in the action.

On February 20, 2024, Evans and Wright moved for summary judgment [D.E. 87, 118] and filed a memorandum in support [D.E. 91, 120], statement of material facts [D.E. 92, 119], and exhibits [D.E. 93–103]. On March 20, 2024, Sabara Roberts responded in opposition [D.E. 105, 117] and filed a statement of material facts [D.E. 106, 117-1]. On April 15, 2024, Evans and Wright replied [D.E. 111, 121] and filed a reply statement of material facts [D.E. 112, 122]. On July 19, 2024, Evans and Wright filed a "[s]uggestion of [s]ubsequently [d]ecided [c]ontrolling or [p]otentially [c]ontrolling [a]uthority" [D.E. 114]. As explained below, the court grants in part and denies in part defendants' motion for summary judgment. The only remaining claim is Sabara Roberts's excessive force claim under 42 U.S.C. § 1983 and the Fourth Amendment against Evans.

I.

Adrian Roberts, a veteran with post-traumatic stress disorder and schizoaffective disorder, was involuntary committed in North Carolina on two separate occasions before August 18, 2020. See Def.'s Statement of Material Facts ("DSMF") [D.E. 119] ¶¶ 36–37, 45; Pl.'s Statement of Material Facts ("PSMF") [D.E. 117-1] ¶¶ 36–37, 45. On August 18, 2020, Sabara Roberts, Adrian Roberts's wife, called the Veterans Administration's ("VA") medical director to initiate crisis management for Adrian Roberts and gather information on mental health treatment options for him. See DSMF ¶¶ 2, 10; PSMF ¶¶ 2, 10. Shortly after 10:00 AM, the VA sent Tamikco Bethea

2

("Bethea"), a mental health professional, to the Roberts's residence in Fayetteville, North Carolina. See DSMF ¶¶ 12, 123; PSMF ¶¶ 12, 123. Bethea planned to conduct a mental health wellness check on Adrian Roberts. See DSMF ¶¶ 12, 39, 123; PSMF ¶¶ 12, 39, 123. As part of the mental health wellness check, the Cumberland County Sheriff dispatched Deputy Doody and Deputy Jones to Robert's house to accompany Bethea. See DSMF ¶ 14; PSMF ¶ 14.

Before arriving, Bethea informed Doody and Jones about Adrian Roberts's history and what Sabara Roberts had reported regarding his condition. See DSMF ¶ 15; PSMF ¶ 15. Bethea believed that Adrian Roberts was an unmedicated bipolar and schizophrenic individual undergoing a paranoid mental health crisis. See DSMF ¶ 16; PSMF ¶ 16. Bethea also relayed information from Sabara Roberts to Doody and Jones that Adrian Roberts "had machetes, knives, and daggers in his residence" and "kept them all within hands reach." DSMF ¶ 20; see PSMF ¶ 20. Furthermore, Bethea stated that Adrian Roberts was "extremely paranoid and threatening, believing that the state and federal governments were spying on and planning to attack him and that the neighborhood children were disguised assassins." DSMF ¶ 21; see PSMF ¶ 21. The parties dispute, however, whether Doody believed that Adrian Roberts was violent. Compare PSMF ¶ 149, with Def.'s Reply Statement of Material Facts ("RDSMF") [D.E. 122] ¶ 149; see [D.E. 93-11] 18 (affirming that Adrian Roberts did not "strike [Doody] as violent.").

At 11:36 AM, Bethea, Doody, and Jones arrived at the Roberts's residence. See DSMF ¶¶ 22–23; PSMF ¶¶ 22–23, 150; RDSMF ¶ 150. As the group approached, Adrian Roberts opened a window, asked why they were at his residence, and told them to leave. See DSMF ¶¶ 23–24; PSMF ¶¶ 23–24. In response, Doody and Jones explained from the street that Bethea came to help Adrian Roberts. See DSMF ¶ 25; PSMF ¶ 25. Adrian Roberts responded with sexually aggressive comments to Bethea. See DSMF ¶ 26; PSMF ¶ 26. Nonetheless, Bethea completed her assessment

3

from the street. See DSMF ¶ 26; PSMF ¶ 26. The parties dispute whether anyone knew Adrian Roberts was home alone. Compare PSMF ¶ 148, with RDSMF ¶ 148; see [D.E. 93-16] 14–15 (recounting a phone call with Sabara Roberts where she "said she couldn't go home" and feared for her safety and her son's life).

As the group prepared to leave, Adrian Roberts exited the front door, engaged in aggressive behavior, acted "out of it," and filmed the group. DSMF ¶¶ 27–31; see PSMF ¶¶ 27–31. Bethea called Sabara Roberts twice during this interaction and explained to Sabara Roberts that she could only treat Adrian Roberts by initiating the VA's process for involuntary commitment. See DSMF ¶¶ 32–34; PSMF ¶¶ 32–34. Sabara Roberts was familiar with this process. See DSMF ¶¶ 36, 40; PSMF ¶¶ 36, 40. She had signed papers to involuntarily commit Adrian Roberts two times before August 18, 2020. See DSMF ¶¶ 36, 40; PSMF ¶¶ 36, 40. Sabara Roberts also told Bethea she was afraid of Adrian Roberts. See DSMF ¶ 38; PSMF ¶ 38.

At 11:48 AM, Bethea, Doody, and Jones left Adrian Roberts's residence. See PSMF ¶ 150; RDSMF ¶ 150. At 2:42 PM, Sabara Roberts filed an affidavit in state court to begin Adrian Roberts's third involuntary commitment. See DSMF ¶¶ 41–49; PSMF ¶¶ 41–49. A North Carolina magistrate issued a civil commitment order the same day. See DSMF ¶¶ 41–49; PSMF ¶¶ 41–49. The court sent the civil commitment order to Captain Parker, who called Sabara Roberts and began gathering information on Adrian Roberts's delusions and home security. Compare DSMF ¶¶ 50–55; with PSMF ¶¶ 50–55; see [D.E. 93-10] 172 (Sabara Roberts stating that she was unaware if Adrian Roberts had barricaded himself inside the residence); [D.E. 93-21] ¶¶ 15–17 (Whitman stating that Sabara Roberts told her Adrian Roberts barricades the doors). Another deputy told Senior Sergeant Whitman that Adrian Roberts "would only speak through closed doors and windows, that he was very violent toward law enforcement, and that multiple [d]eputies could be

4

required to [serve] the [involuntary commitment order] and to take [Adrian] Roberts into custody." See DSMF ¶ 56; PSMF ¶ 56. Whitman conveyed this information to Parker. See DSMF ¶ 56; PSMF ¶ 56.

Sometime after 4:00 PM, with this knowledge, Parker ordered the Cumberland County's Sheriff's Office Special Response Team—a group specially trained to handle high risk situations, including de-escalation—on standby to serve the involuntary commitment order and transport Adrian Roberts after taking him into custody. See DSMF ¶¶ 57–63, 123; PSMF ¶¶ 57–63, 123. Parker knew that Wright maintained policies prohibiting discrimination and excessive force. See DSMF ¶¶ 64–65, 138–40; PSMF ¶¶ 64–65, 138–40. Parker completed crisis intervention training but was not a member of the Special Response Team. See PSMF ¶ 154; RDSMF ¶ 154. Parker knew, however, that the Special Response Team would "potentially be better [than regular deputies] because they were [Crisis Intervention] trained." PSMF ¶ 65 (quotation omitted); see DSMF ¶ 65. Parker continued to gather information while considering whether to send regular deputies or the Special Response Team. See DSMF ¶¶ 65–70; PSMF ¶¶ 65–70; [D.E. 93-16] 42–43, 44–46. Parker learned that Adrian Roberts had a history of violence towards law enforcement and an arrest for assault on a female. See DSMF ¶¶ 69–70, 75; PSMF ¶¶ 69–70, 75. Parker also knew Adrian Roberts had been arrested for violent crimes, although the parties dispute which violent crimes. See DSMF ¶¶ 17–19; PSMF ¶¶ 17–19; [D.E. 93-10] 90–91 (discussing a robbery and high-speed chase); [D.E. 93-16] 18–19 (discussing an arrest for sexual assault on a female); [D.E. 93-18] 31–32 (discussing an arrest for common law robbery). Because of Adrian Roberts's history, the Chief Deputy, Major Peterson, and Parker decided to send the Special Response Team. See DSMF ¶ 71; PSMF ¶ 71.

5

Parker briefed the Special Response Team on Adrian Roberts. See DSMF ¶¶ 51–53, 72–76, 78; PSMF ¶¶ 51–53, 72–76, 78. The Special Response Team developed a plan to take Adrian Roberts into custody based on this briefing. See DSMF ¶ 79; PSMF ¶ 79. Under the plan, Doody, Jones, and Parker, would go to Robert's residence, and the Special Response Team would hide nearby. See DSMF ¶ 80; PSMF ¶ 80. Doody, Jones, and Parker would try to persuade Adrian Roberts to come outside. See DSMF ¶ 80; PSMF ¶ 80. Once Adrian Roberts came outside, the Special Response Team would appear, serve the commitment order on Adrian Roberts, take him into custody, and transport him for mental health treatment. See DSMF ¶ 80; PSMF ¶ 80. If Adrian Roberts refused to come outside, Doody, Jones, and Parker would drive away with the hope that Adrian Roberts would exit his residence to film them, allowing the Special Response Team to appear, serve the commitment order, take Adrian Roberts into custody, and transport him for mental health treatment. See DSMF ¶ 81; PSMF ¶ 81. To diminish risks, the plan involved no forcible entry. See DSMF ¶ 82; PSMF ¶ 82. Moreover, the plan did not include using a social worker or hostage negotiator when serving the involuntary commitment order. See PSMF ¶ 155; RDSMF ¶ 155; [D.E. 93-16] 22–23.

Parker, Doody, Jones, and the Special Response Team met near the Roberts's residence. See DSMF ¶ 77; PSMF ¶ 77. The Special Response Team assembled alongside the Roberts's residence where they were out of sight to anyone inside. See DSMF ¶ 83; PSMF ¶ 83. Parker, Doody, and Jones approached a window, let Adrian Roberts know that they were present for a wellness check, and asked Adrian Roberts to come outside to talk. See DSMF ¶¶ 84–85; PSMF ¶¶ 84–85. Adrian Roberts became irate, refused to come outside, and demanded that the police leave. See DSMF ¶ 86; PSMF ¶¶ 86, 159; RDSMF ¶ 159. The parties dispute the length of this interaction. Compare DSMF ¶ 124, and RDSMF ¶ 160, with PSMF ¶¶ 124, 160. It lasted between

6

approximately seven minutes and two hours. Compare DSMF ¶ 124, and RDSMF ¶ 160, with PSMF ¶¶ 124, 160.

After Adrian Roberts declined to come outside, and in accordance with the plan, Doody, Jones, and Parker drove away. Adrian Roberts, however, did not come outside. See DSMF ¶¶ 87–88; PSMF ¶¶ 87–88. When the plan failed, Major Peterson authorized the Special Response Team to make a forcible entry and take Adrian Roberts into custody pursuant to the civil commitment order. See DSMF ¶ 89; PSMF ¶ 89.

As the Special Response Team assembled outside of the front door, Doody, Jones, and Parker returned to make one last attempt to persuade Adrian Roberts to come outside. See DSMF ¶¶ 90–95; PSMF ¶¶ 90–95. Meanwhile, Adrian Roberts became increasingly agitated. See DSMF ¶¶ 90–95; PSMF ¶¶ 90–95. No member of the Special Response Team spoke to Roberts. See PSMF ¶ 154; RDSMF ¶ 154. Parker believed that Adrian Roberts was preparing to attack, but Adrian Roberts never made any threatening statements to officers. See DSMF ¶ 95; PSMF ¶ 95; [D.E. 93-16] 27. After Parker determined that Adrian Roberts had no items in his hands and his back towards the door, Parker ordered the Special Response Team to enter the residence. See DSMF ¶ 96; PSMF ¶ 96.

Corporal Fermin, equipped with a breaching tool, announced the Sheriff's Office's presence and struck the front door, but the door failed to open. See DSMF ¶¶ 97–99; PSMF ¶¶ 97–99. Parker believed that he saw Adrian Roberts pick something up and warned the team. See DSMF ¶¶ 100–02; PSMF ¶¶ 100–02; [D.E. 93-18] 47 (picture of Adrian Roberts's front door). Fermin struck the door a second time, and the door opened. See DSMF ¶ 103; PSMF ¶ 103. Evans entered first. See DSMF ¶ 103; PSMF ¶ 103.

7

The parties dispute what happened when Evans and the other deputies entered. Defendants contend that after the door opened, Adrian Roberts ran at Fermin and Evans with a machete held over his head. Compare DSMF ¶¶ 100, 104–05, 107–08, with PSMF ¶¶ 100, 104–05, 107–08; see [D.E. 93-12] 21, 24, 34 (Evans asserting Adrian Roberts was "running" at him and he shot five shots to protect his team); [D.E. 93-13] 18 (Fermin asserting Adrian Roberts was "walking towards us at a really fast pace"); [D.E. 93-14] 22 (Hernandez asserting Adrian Roberts was approaching "aggressively fast"); [D.E. 93-16] 47–48. Evans said "Whoa" to Adrian Roberts and stepped backwards. [D.E. 93-12] 21; see [D.E. 93-14] 22–23. Evans then quickly discharged five rounds towards Adrian Roberts within seconds of the breach, from either inside or outside the front door of the residence. Compare DSMF ¶¶ 106, 109–16, 118, and RDSMF ¶ 162, with PSMF ¶¶ 106, 109–16, 118. When Evans fired, Adrian Roberts was 4 ½ to 8 feet away from Evans. See [D.E. 93-13] 18–20, 33 (Fermin estimating five to eight feet from the threshold of the front door and a shot within a second or less from the breach); [D.E. 93-14] 16–17 (Hernandez asserting Evans shot from outside the door almost instantaneously following the breach); [D.E. 93-15] 21 (Murphy asserting Evans shot from outside the door less than 30 seconds after breaching the door).

Sabara Roberts disagrees with the deputies.[1] She contends that the evidence shows that Adrian Roberts had his back to the deputies and that Evans shot Adrian Roberts in the back. See PMSF ¶¶ 104, 106–09, 114–16, 162; [D.E. 93-18] 47 (picture of front of residence displaying visibility through the door); [D.E. 105-3] 1 (autopsy report showing three gunshot wounds, two on Robert's left arm and one on his back).

---

[1] Sabara Roberts was not at the residence when Evans shot Adrian Roberts. See [D.E. 93-10] 165.

8

The parties agree that Evans shot Adrian Roberts three times and that Adrian Roberts fell backwards and landed on his back and side. See DSMF ¶ 117; PSMF ¶¶ 117, 161; RDSMF ¶ 161. Two machetes were found next to Adrian Roberts's body. See DSMF ¶ 122; PSMF ¶ 122. The time of the deputies' arrival at Adrian Roberts's residence to the deputies departing after the shooting took under one hour. Compare DSMF ¶ 124, with PSMF ¶ 124; See PSMF ¶ 153, 156–158, 160; RDSMF ¶ 153, 156–58, 160; [D.E. 93-12] 20; [D.E. 93-16] 21, 25–27.

After Evans shot Adrian Roberts, the Special Response Team entered and cleared Adrian Roberts's residence. See DSMF ¶¶ 119–21; PSMF ¶¶ 119–21. Evans and other Special Response Team members administered first aid and CPR to Adrian Roberts until emergency medical services arrived. See DSMF ¶¶ 119–21; PSMF ¶¶ 119–21. Nonetheless, Adrian Roberts died. See DSMF ¶¶ 2, 121; PSMF ¶¶ 2, 121.

## II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of

9

material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

## A.

Defendants seek summary judgment on Sabara Roberts's excessive force claim under 42 U.S.C. § 1983. See [D.E. 91] 27–32. The Fourth Amendment protects citizens from excessive force during arrest, including for involuntary commitment. See, e.g., Graham v. Connor, 490 U.S. 386, 395 (1989); Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 899–906 (4th Cir. 2016); Valladares v. Cordero, 552 F.3d 384, 388 (4th Cir. 2009); Young v. Prince George's Cnty., 355 F.3d 751, 758 (4th Cir. 2004), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010); Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003). To determine whether an officer's use of force was excessive, the court employs a "reasonableness" test. See, e.g., Graham, 490 U.S. at 396; Valladares, 552 F.3d at 388. The court examines the objective reasonableness of the officer's actions, rather than the officer's subjective motivations. See, e.g., Graham, 490 U.S. at 397; Young, 355 F.3d at 756–57; Jones, 325 F.3d at 527.

10

The reasonableness test under the Fourth Amendment is not "capable of precise definition or mechanical application." Bell v. Wolfish, 441 U.S. 520, 559 (1979). The court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Unus v. Kane, 565 F.3d 103, 117 (4th Cir. 2009) (quotation omitted); Young, 355 F.3d at 757. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396–97. The court must carefully examine "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.; see Hensley ex rel. N.C. v. Price, 876 F.3d 573, 583 (4th Cir. 2017).

In an involuntary commitment case, the court considers a person's diminished capacity and appropriate tactics to engage with an individual with diminished capacity. See Armstrong, 810 F.3d at 900 ("[T]he use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. And even when this ideal course is not feasible, officers who encounter an unarmed and minimally threatening individual who is exhibiting conspicuous signs that he is mentally unstable must de-escalate the situation and adjust the application of force downward." (cleaned up)); Martin v. City of Broadview Heights, 712 F.3d 951, 962 (6th Cir. 2013); Bryan v. MacPherson, 630 F.3d 805, 829 (9th Cir. 2010) ("The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently

11

committed a serious offense."); Champion v. Outlook Nashville, Inc., 380 F.3d 893, 904 (6th Cir. 2004) ("It cannot be forgotten that the police were confronting an individual whom they knew to be mentally ill . . . even though the [o]fficers may not have known the full extent of [the person's] autism and . . . unresponsiveness. The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted."); Smith v. Town of S. Hill, 611 F. Supp. 3d 148, 176 (E.D. Va. 2020). Moreover, taking a "mentally disturbed individual" into custody to prevent self-harm does not merit grievous injury. Armstrong, 810 F.3d at 900.

"Force that imposes serious consequences requires significant circumscription." Id. at 902. "Before an officer may use deadly force, he should give a warning if it is feasible." Price, 876 F.3d at 584 (quotation omitted). In analyzing the use of force, the court also may consider the extent of the plaintiff's injury. See Jones, 325 F.3d at 527.

In evaluating these factors, the court must not engage in Monday-morning quarterbacking. Instead a court must assess the reasonableness of the officer's actions based on the information that the officer possessed "immediately prior to and at the very moment" that the officer employed the force. Betton v. Belue, 942 F.3d 184, 191 (4th Cir. 2019) (quotation omitted); see Graham, 490 U.S. at 396–97; Waterman v. Batton, 393 F.3d 471, 477 (4th Cir. 2005); Park v. Shiflett, 250 F.3d 843, 853 (4th Cir. 2001); Robinson v. Best, 689 F. Supp. 3d 147, 161 (E.D.N.C. 2023); Bostic v. Rodriguez, 667 F. Supp. 2d 591, 613 (E.D.N.C. 2009).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see City of Escondido v. Emmons, 586 U.S. 38, 42–44 (2019) (per curiam); Kisela v. Hughes, 584 U.S. 100, 103–08 (2018) (per

12

curiam); <u>District of Columbia v. Wesby</u>, 583 U.S. 48, 62–63 & n.7 (2018); <u>Hernandez v. Mesa</u>, 582 U.S. 548, 554 (2017); <u>Ziglar v. Abbasi</u>, 582 U.S. 120, 150–52 (2017); <u>Mullenix v. Luna</u>, 577 U.S. 7, 11–13 (2015) (per curiam); <u>Taylor v. Barkes</u>, 575 U.S. 822, 825–27 (2015) (per curiam); <u>City & Cnty. of S.F. v. Sheehan</u>, 575 U.S. 600, 611 (2015); <u>Carroll v. Carman</u>, 574 U.S. 13, 16– 17 (2014) (per curiam); <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012); <u>Camreta v. Greene</u>, 563 U.S. 692, 705 (2011); <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009); <u>King v. Riley</u>, 76 F.4th 259, 264–68 (4th Cir. 2023); <u>Sharpe v. Winterville Police Dep't</u>, 59 F.4th 674, 682–84 (4th Cir. 2023); <u>Burns-Fisher v. Romero-Lehrer</u>, 57 F.4th 421, 424 (4th Cir. 2023); <u>Tobey v. Jones</u>, 706 F.3d 379, 385 (4th Cir. 2013). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986); <u>see Kisela</u>, 584 U.S. at 103–04; <u>Wesby</u>, 583 U.S. at 63; <u>Ziglar</u>, 582 U.S. at 151–52; <u>White</u>, 580 U.S. at 79–80; <u>Mullenix</u>, 577 U.S. at 12; <u>Taylor</u>, 575 U.S. at 825; <u>Sheehan</u>, 575 U.S. at 611; <u>Carroll</u>, 574 U.S. at 17.

In analyzing qualified immunity, the court asks (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and (2) "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." <u>Pearson</u>, 555 U.S. at 232 (quotations omitted); <u>see Wood v. Moss</u>, 572 U.S. 744, 757 (2014); <u>Lewis v. Caraballo</u>, 98 F.4th 521, 530 (4th Cir. 2024); <u>Knibbs v. Momphard</u>, 30 F.4th 200, 214 (4th Cir. 2022); <u>Brockington v. Boykins</u>, 637 F.3d 503, 506 (4th Cir. 2011); <u>Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.</u>, 597 F.3d 163, 169 (4th Cir. 2010). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011) (cleaned up); <u>see Rivas-Villegas v. Cortesluna</u>, 595 U.S. 1, 4–5 (2021) (per curiam); <u>King</u>, 76 F.4th at 265; <u>Sharpe</u>, 59 F.4th at 682–84. Although a

13

case need not be directly controlling, "existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741; see Rivas-Villegas, 595 U.S. at 4–5; Reichle, 566 U.S. at 664; King, 76 F.4th at 266–68; Sharpe, 59 F.4th at 682–84.

To determine whether an official's conduct violates clearly established law, a court must first specifically define the right. See, e.g., City of Tahlequah v. Bond, 595 U.S. 9, 11–12 (2021) (per curiam). Then, based on that specifically defined right, the court must determine whether existing precedent placed the statutory or constitutional question "beyond debate." Kisela, 584 U.S. at 104 (quotation omitted). "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." Bond, 595 U.S. at 12 (quotation omitted); see Wesby, 583 U.S. at 63. An official is entitled to qualified immunity "unless existing precedent 'squarely governs' the specific facts at issue." Kisela, 584 U.S. at 104 (quoting Mullenix v. Luna, 577 U.S. 7, 13 (2015) (per curiam)); Wesby, 583 U.S. at 63–66.

The Supreme Court has "not yet decided what precedents—other than [its] own—qualify as controlling authority for purposes of qualified immunity." Wesby, 583 U.S. at 66 n.8; see Kisela, 584 U.S. at 103–08; Taylor, 575 U.S. at 825–27; Sheehan, 575 U.S. at 613–14; Carroll, 574 U.S. at 16–17. In the Fourth Circuit, "existing precedent" includes precedent of the United States Supreme Court, the Fourth Circuit, and the highest court of the state in which the action arose. See Doe ex rel. Johnson, 597 F.3d at 176; see Sharpe, 59 F.4th at 683; Dean for & on behalf of Harkness v. McKinney, 976 F.3d 407, 417 (4th Cir. 2020).

To determine whether an officer's conduct violates clearly established law, a court must first specifically define the right. See, e.g., Bond, 595 U.S. at 12. "Such specificity is especially important in the Fourth Amendment context where it is sometimes difficult for an officer to

14

determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Id. at 12–13 (quotation omitted). Then, based on that specifically defined right, the court must determine whether existing precedent placed the statutory or constitutional question "beyond debate." Kisela, 584 U.S. at 104 (quotation omitted). "It is not enough that the rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Bond, 595 U.S. at 11 (quotation omitted); see Wesby, 583 U.S. at 63. An officer is entitled to qualified immunity "unless existing precedent 'squarely governs' the specific facts at issue." Kisela, 584 U.S. at 104 (quoting Mullenix, 577 U.S. at 13); see Wesby, 583 U.S. at 63–66. Nonetheless, court should not "assume that government officials are incapable of drawing logical inferences, reasoning by analogy, or exercising common sense." Harris v. Town of S. Pines, 110 F.4th 633, 644 (4th Cir. 2024) (quotation omitted).

"With deadly force cases, special difficulties can arise during summary judgment." Stanton v. Elliott, 25 F.4th 227, 234 (4th Cir. 2022) (collecting cases). "Often, the officer has killed the only other potential witness." Id. Thus, courts cannot simply accept "an officer's self-serving statements and must consider all contradictory evidence." Id. "[A]n officer need not see the weapon in a suspect's hands to find him objectively dangerous." Id. at 234–35. In a deadly force case, the court must "consider whether the hypothetical reasonable officer in that situation would have had probable cause to believe that the suspect posed a threat of serious physical harm, either to the officer or to others" at the moment the officer used deadly force. Id. at 233. Courts should place themselves in the heat of the moment, without the benefit of hindsight. See id. "[A]n officer must make a reasonable assessment" that he or another has been threatened with a lethal weapon to justify using of deadly force. Betton, 942 F.3d at 191 (quotation omitted); see, e.g., Aleman v.

15

City of Charlotte, 80 F.4th 264, 295–96 (4th Cir. 2023), cert. denied, 144 S. Ct. 1032 (2024); Franklin v. City of Charlotte, 64 F.4th 519, 533–34 (4th Cir. 2023); Knibbs, 30 F.4th at 223–26; Price, 876 at 585–86 (4th Cir. 2017); Cooper v. Sheehan, 735 F.3d 153, 158–60 (4th Cir. 2013); Calliste v. City of Charlotte, 695 F. Supp. 3d 708, 725–26 (W.D.N.C. 2023); Pritchard v. Mobley, 595 F. Supp. 3d 438, 449–52 (E.D.N.C. 2022). "[P]ainful, injurious, serious inflictions of force . . . do not become reasonable simply because officers have authorization to arrest a subject who is unrestrained." Smith, 611 F. Supp. 3d at 176.

In Pearson, the Supreme Court held that the qualified-immunity analysis need not proceed in a particular sequence, and that "[t]he judges of the district courts and the courts of appeals [may] exercise their sound discretion in deciding which of the two prongs . . . should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236; see King, 76 F.4th at 265. Qualified immunity shields a defendant if the answer to either prong is "no." See al-Kidd, 563 U.S. at 735; Miller v. Prince George's Cnty., 475 F.3d 621, 627 (4th Cir. 2007); Bostic, 667 F. Supp. 2d at 605–06.

As for the first Graham factor, Adrian Roberts was the subject of an involuntary commitment order, and Evans could consider Adrian Roberts's mental health and dangerousness as relevant. See Armstrong, 810 F.3d at 900. As discussed, under the plan, Evans needed to "de-escalate the situation and adjust the application of force downward." Id. The facts in dispute, however, are necessary to determine whether Evans used reasonable force. Those facts include whether Adrian Roberts was armed when Evans fired, whether Evans knew that Adrian Roberts was alone at the residence, and whether Evans could have done more to deescalate the situation. Compare DSMF ¶¶ 100, 104–05, 107–08, and RDSMF ¶¶ 148, 155, with PSMF ¶¶ 100, 104–05, 107–08, 148, 155; see [D.E. 93-12] 21, 24, 34; [D.E. 93-13] 15, 18, 30 (Fermin discussing having

16

a less lethal shotgun with bean bags available); [D.E. 93-14] 22; [D.E. 93-15] 20–21; [D.E. 93-16] 22, 47–48. Thus, viewing the evidence in the light most favorable to Sabara Roberts, the first Graham factor weighs against Evans's imposition of force.

As for the second Graham factor, the facts are in dispute about whether Adrian Roberts posed an immediate threat to the safety of the officers or others or was resisting arrest. Compare DSMF ¶¶ 100, 104–16, 118, and RDSMF ¶ 162, with PSMF ¶¶ 100, 104–16, 118, 162; see [D.E. 93-12] 21, 24, 34; [D.E. 93-13] 18–20; [D.E. 93-14] 16–17, 22; [D.E. 93-15] 20–21; [D.E. 93-16] 47–48; [D.E. 93-18]; [D.E. 105-3] 1. Although most of the deposition testimony (including expert testimony)[2] in this case supports Evans's testimony, a reasonable jury could find that, based on the autopsy report and picture of the residence, Adrian Roberts was unarmed and facing backwards when Evans shot him from eight feet away without any warning. Alternatively, a reasonable jury could find that Adrian Roberts was walking towards officers with a pocketknife. See [D.E. 93-10] 164–65. Thus, viewing the evidence in the light most favorable to Sabara Roberts, the second and third Graham factors weigh against Evans's use of force. Finally, when considering the proportionality of the force in light of the Graham factors, a fatal shooting is the highest use of serious force. Cf. Armstrong, 810 F.3d at 902.

As for qualified immunity, the court cannot simply accept as true Evans's statements and testimony given the contradictory autopsy evidence. Viewing the evidence in the light most

---

[2]  Defendants proffer three experts who opine that Evans fired his gun from outside the door and was in imminent danger. See DSMF ¶¶ 125–37; PSMF ¶¶ 125–37. The opinion testimony does not entitle Evans or Wright to summary judgment on Sabara Roberts's excessive force claim. Instead, a jury gets to consider the evidence. See, e.g., Alevromagiros v. Hechinger Co., 993 F.2d 417, 421 (4th Cir. 1993); Textron Inc. ex rel. Homelite Div. v. Barber-Colman Co., 903 F. Supp. 1558, 1564–65 (W.D.N.C. 1995).

17

favorable to Sabara Roberts, Evans shot Adrian Roberts twice in his left arm and once in his back. See [D.E. 105-3] 1–3, 6. The parties vigorously dispute whether Adrian Roberts was armed or a threat and whether Evans had time to warn Adrian Roberts before shooting him. See [D.E. 93-12] 21; [D.E. 93-14]; 22–23; [D.E. 93-15] 20–21; [D.E. 93-16] 27–28. Two machetes were found next to Adrian Roberts's body, but the evidence is disputed whether Evans saw anything in Adrian Roberts's hands before shooting him. See DSMF ¶ 122; PSMF ¶ 122; [D.E. 93-13] 19; [D.E. 93-16] 33. When the evidence is viewed in the light most favorable to Sabara Roberts, Evans's testimony that Adrian Roberts ran at Fermin and Evans with a machete over his head, resulting in Evans discharging five rounds towards Adrian Roberts, also conflicts with the autopsy report. Compare [D.E. 105-3] 1–3, 6 with [D.E. 93-12] 21, 24, 34. Thus, genuine issues of material fact exist concerning Evans's use of force. If a jury found that Adrian Roberts was unarmed and that Evans shot Adrian Roberts in the back while Adrian Roberts receded from the door, a reasonable jury could find that Evans violated Adrian Roberts's clearly established rights. See, e.g., Stanton, 25 F.4th at 237. At summary judgment, this dispute defeats qualified immunity. See id.

In opposition to this conclusion, defendants cite Rambert v. City of Greenville, 107 F.4th 388 (4th Cir. 2024). In Rambert, a police officer responded to an in-progress breaking and entering, which was a potentially dangerous crime with an imminent threat to the people in the residence. See id. at 399. A screaming man came running towards the officer, and the officer ordered the man to get on the ground eight times. See id. The man did not. See id. The officer retreated from the sidewalk to the street, but the man continued to charge at him. See id. The officer fired shots at the man. See id. Nonetheless, after falling, the man stood back up and continued to move towards the officer. See id. After the man tackled the officer, both fell to the

18

ground, and both tried to get up. See id. at 399–400. The officer did not fire again. See id. at 400. The court concluded that based on these facts, the officer did not use excessive force. See id.

The facts of Rambert are distinguishable. Evans was responding to an involuntary commitment order, not an ongoing potentially dangerous crime. See DSMF ¶¶ 57–63, 123; PSMF ¶¶ 57–63, 123. Evans did not warn Adrian Roberts. See [D.E. 93-12] 31; [D.E. 93-14] 22–23. Evans also did not retreat, taking at most a step back. See [D.E. 93-12] 31; [D.E. 93-14] 22–23.

As for Sabara Roberts's excessive force claim against Wright, the doctrine of respondeat superior generally does not apply to a section 1983 claim. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009); King v. Rubenstein, 825 F.3d 206, 224 (4th Cir. 2016); Carter v. Morris, 164 F.3d 215, 220–21 (4th Cir. 1999), abrogated on other grounds by Wilkins, 559 U.S. at 34; Shaw v. Stroud, 13 F.3d 791, 798–99 (4th Cir. 1994). Instead, where a defendant is sued based on supervisory liability, "[a] plaintiff must show actual or constructive knowledge of a risk of constitutional injury, deliberate indifference to that risk, and an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Carter, 164 F.3d at 221 (quotations omitted); see King, 76 F.4th 259, 269; Shaw, 13 F.3d at 799.

Even viewing the evidence in the light most favorable to Sabara Roberts, the evidence fails to support a connection between Wright and Evans's alleged violation of Adrian Roberts's constitutional right to be free from the use of excessive force. Cf. [D.E. 91] 31–32. Notably, Sabara Roberts fails to provide evidence in her statement of material facts concerning the personal involvement of Wright in Evans's shooting of Adrian Roberts. See, e.g., Iqbal, 556 U.S. at 676–77; Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–94 (1978); Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985). Furthermore, no evidence suggests that Wright had constructive knowledge of the risk of constitutional injury. See DSMF ¶¶ 79–82; PSMF ¶¶ 79–82. Moreover, because

19

there is no evidence that Wright's official conduct towards Adrian Roberts violates clearly established law, Wright is entitled to qualified immunity. Thus, even viewing the record in the light most favorable to Sabara Roberts, the court grants Wright summary judgment on Sabara Roberts's excessive force claim under 42 U.S.C. § 1983 and the Fourth Amendment.

**B.**

Defendants seek summary judgement on Sabara Roberts's unlawful entry claim under 42 U.S.C. § 1983 and the Fourth Amendment. See [D.E. 87] 1. Sabara Roberts responds that defendants' memorandum of support failed to address her unlawful entry claim; therefore, she is entitled to a jury trial on this claim. See [D.E. 117] 10 n.3. Sabara Roberts is incorrect. See [D.E. 87] 1 (defendants moved for summary judgment "on all claims raised by the operative complaint . . . ."); [D.E. 121] 11–12.

The Fourth Amendment guarantees "the right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures." U.S. Const. amend. IV. When an arrest warrant has been issued, however, it "implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980); see United States v. Brinkley, 980 F.3d 377, 384–86 (4th Cir. 2020); United States v. Hall, 495 F. App'x 319, 323–24 (4th Cir. 2012) (unpublished). Courts have typically treated North Carolina's involuntary commitment orders as arrest warrants. See Vaughan v. Foltz, No. 2:16-CV-61, 2019 WL 1265055, at *13 n.23 (E.D.N.C. Mar. 19, 2019) (unpublished), aff'd, 825 F. App'x 131 (4th Cir. 2020) (per curiam) (unpublished), and abrogated on other grounds by Wilson v. City of Jacksonville, 682 F. Supp. 3d 481 (E.D.N.C. 2023); In re Moore, 234 N.C. App. 37, 41, 758 S.E.2d 33, 36 (2014); In re Zollicoffer, 165 N.C. App. 462, 466, 598 S.E.2d 696, 699 (2004); In re Reed, 39 N.C. App. 227, 229, 249 S.E.2d 864, 866 (1978); see

20

also S.P. v. City of Takoma Park, 134 F.3d 260, 271 (4th Cir. 1998) (collecting cases applying Fourth Amendment principles to analogous state civil commitment orders).

On August 18, 2020, a North Carolina court issued an involuntary commitment order for Adrian Roberts, and defendants had good reason to believe that Adrian Roberts was home when they decided to execute the order. See [D.E. 93-10] 275; DSMF ¶¶ 23–24, 41–49; PSMF ¶¶ 23–24, 41–49. Moreover, Sabara Roberts does not challenge the validity of the civil commitment order. Cf. [D.E. 47] 7. Instead, Sabara Roberts relies on her own testimony that the issuing magistrate orally prohibited the deputies from using force to enter the Roberts's residence. See PSMF ¶ 151; [D.E. 93-10] 154–55. The civil commitment order contains no such limitation. See [D.E. 93-10] 275. Furthermore, the court declines to rely on Sabara Roberts's hearsay to alter the order. See Fed. R. Civ. P. 56(c).

"Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner . . . ." Messerschmidt v. Millender, 565 U.S. 535, 546, 132 (2012). This principle applies here. Even viewing the evidence in the light most favorable to Sabara Roberts, there is no genuine dispute of material fact concerning whether defendants violated the Fourth Amendment when they entered the residence to take Adrian Roberts into custody pursuant to the civil commitment order. They did not. See e.g., Payton, 445 U.S. at 603; Brinkley, 980 F.3d at 384–86. Thus, defendants are entitled to qualified immunity on this claim. Accordingly, the court grants summary judgment to defendants on Sabara Roberts's unlawful entry claim under 42 U.S.C. § 1983 and the Fourth Amendment.

C.

Wright seeks summary judgment on Sabara Roberts's ADA Title II failure-to-accommodate claim against Wright. See [D.E. 91] 14–25. Under Title II, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132; see Reyazuddin v. Montgomery Cnty., 789 F.3d 407, 419–21 (4th Cir. 2015).[3] "Only public entities are subject to Title II." Sheehan, 575 U.S. at 610; see Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 208 (1998). Title II applies to "anything a public entity does." Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty., 673 F.3d 333, 338 (4th Cir. 2012) (quotation omitted); Alexander v. Jud. Standards Comm'n, No. 7:20-CV-66, 2020 WL 4278683, at *6 (E.D.N.C. June 11, 2020) (unpublished), report and recommendation adopted, No. 7:20-CV-66, 2020 WL 4279513 (E.D.N.C. July 24, 2020) (unpublished). Public entity means any state government, local government, or any department, agency, special purpose district, or other instrumentality of a state or local government. See 42 U.S.C. §12131(1). A sheriff sued in his official capacity is a public entity. See, e.g., Seremeth, 673 F.3d at 338; Albright v. Sheriffs Dep't Rapides Par., No. CIV.A. 12-2117, 2014 WL 4702579, at *5 (W.D. La. Sept. 22, 2014) (unpublished).

Sabara Robert's amended complaint does not state whether she sued Wright in his individual or official capacity. In his individual capacity, Wright is an individual, not a public entity. See DSMF ¶ 5; PSMF ¶ 5. As an individual, Wright is not subject to liability under Title

---

[3] There is no individual liability under Title II. See, e.g., Doe v. Div. of Youth & Fam. Servs., 148 F. Supp. 2d 462, 489 (D.N.J. 2001); Bracey v. Buchanan, 55 F. Supp. 2d 416, 420 (E.D. Va. 1999).

22

II. See Doe, 148 F. Supp. 2d at 489; Bracey, 55 F. Supp. 2d at 420. Accordingly, the court grants Wright summary judgment on Sabara Roberts's ADA Title II failure-to-accommodate claim in his individual capacity.

If Sabara Roberts's sued Wright in his official capacity, to state a claim under Title II of the ADA, Sabara Roberts must plausibly allege that: (1) Adrian Roberts had a disability; (2) he was otherwise qualified for the benefits of a public service, program, or activity; and (3) he was excluded from participation in or denied the benefits of such service on the basis of his disability. See, e.g., Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 461 (4th Cir. 2012); Constantine, 411 F.3d at 498; Baird, 192 F.3d at 467; Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1264–65 (4th Cir. 1995). To show that Adrian Roberts had a disability, Sabara Roberts must prove (1) that Adrian Roberts had a physical or mental impairment, (2) that this impairment implicated at least one major life activity, and (3) that the limitation was substantial. Heiko v. Colombo Sav. Bank, F.S.B., 434 F.3d 249, 254 (4th Cir. 2006); see 42 U.S.C. § 12102(1)(A). A plaintiff may assert a violation of Title II of the ADA based on "(1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." A Helping Hand, LLC v. Baltimore Cnty., 515 F.3d 356, 362 (4th Cir. 2008) (quotation omitted).

"In the context of arrests," the Fourth Circuit recognizes Title II claims for: "(1) wrongful arrest, where police arrest a suspect based on his disability, not for any criminal activity; and (2) reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees." Waller ex rel. Est. of Hunt v. Danville, 556 F.3d 171, 174 (4th Cir. 2009). "Accommodations that might be expected when time is of no matter," however, "become unreasonable to expect when time is of the essence." Id. at 175.

23

In Waller, the Fourth Circuit held that even though "the officers did not face an immediate crisis," they did face an unstable situation with a man who implied he had weapons, was growing more agitated, and could endanger an officer. Id. Moreover, even assuming a duty of reasonable accommodation under the ADA, the Fourth Circuit held that the delay and personal dynamics incurred from calling other professionals (such as a hostage negotiator) or family members did not constitute a "reasonable accommodation." Id. at 175–76

Similarly, in Seremeth, sheriff's deputies faced an unstable situation with a deaf man, and they called an ASL trainee and attempted to use a man's father to assist in communicating with the deaf man. See Seremeth, 673 F.3d at 340–41. The Fourth Circuit also acknowledged that "the sheriff's office had a contract for a qualified interpreter; the deputies could have handcuffed Seremeth in front of his body to allow him to write notes; and Seremeth lacked the ability to communicate without notes or the use of his hands to sign." Id. at 340. Nonetheless, the Fourth Circuit recognized that a court should not use the ADA "to question the snap judgments of law enforcement officials in situations in which a reasonable officer would fear for his safety and for the safety of those he is charged to protect." Id.

Here, Adrian Roberts experienced post-traumatic stress disorder and schizoaffective disorder, both of which are qualifying disabilities under the ADA. See DSMF ¶¶ 36–37, 45; PSMF ¶¶ 36–37, 45. There is not sufficient evidence, however, to show that Wright excluded Adrian Roberts from participation in, or denied him the benefits of, police protection on the basis of his disabilities. See, e.g., Seremeth, 673 F.3d at 339–41; Waller, 556 F.3d at 175–76.

In opposition, Sabara Roberts argues that Wright should have called a hostage negotiator or social worker to the residence. See [D.E. 117] 3. Under Waller, however, even viewing the evidence in the light most favorable to Sabara Roberts, Wright did not have to call a hostage

24

negotiator or social worker as a "reasonable accommodation." See Waller, 556 F.3d at 177. Accordingly, the court grants summary judgment to Wright on Sabara Roberts's ADA Title II failure-to-accommodate claim. See, e.g., Seremeth, 673 F.3d at 339–41; Waller, 556 F.3d at 174–77.

**D.**

Wright seeks summary judgment on Sabara Roberts's claim under section 504 of the Rehabilitation Act. See [D.E. 91] 14–19, 25–26. Unlike Title II of the ADA, section 504 of the Rehabilitation Act applies only to federal agencies or to "any program or activity receiving [f]ederal financial assistance." 29 U.S.C. § 794(a); see Paulone v. City of Frederick, 787 F. Supp. 2d 360, 371 (D. Md. 2011). There is no individual liability under section 504. See Bracey, 55 F. Supp. 2d at 420; cf. Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996); EEOC v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1279 (7th Cir. 1995).

"The scope of [T]itle II's coverage of public entities is comparable to the coverage of Federal Executive agencies under the 1978 amendment to section 504, which extended section 504's application to all programs and activities 'conducted by' Federal Executive agencies, in that [T]itle II applies to anything a public entity does." 28 C.F.R. § Pt. 35, App. B. Based on the reasoning concerning Sabara Robert's Title II claim, the court grants Wright summary judgment on Sabara Roberts's section 504 claim.

**III.**

In sum, the court GRANTS IN PART and DENIES IN PART defendants' motion for summary judgment [D.E. 87, 118]. Plaintiff's excessive force claim under 42 U.S.C. § 1983 and the Fourth Amendment against defendant Evans survives. The court GRANTS summary judgment to defendants on all other claims and DISMISSES defendant Wright from this action. The parties

25

SHALL engage in a court-hosted settlement conference with United States Magistrate Judge James

E. Gates.

SO ORDERED. This _30_ day of September, 2024.


_JAMES C. DEVER III_
United States District Judge